FILED

FEB 23 2022

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Criminal No. 22-30024-SPM |
| STEVEN DORFMAN, | ) | |
| CANDIDA L. GIROUARD, | ) | Title 18, United States Code, Sections 1341, |
| (also known as "Cameron" | ) | 1343, 1349, and 2 |
| and "Cam"), and | ) | |
| JOHN A. SAND, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INDICTMENT

**THE GRAND JURY CHARGES:**

### COUNT ONE
### Conspiracy to Commit Wire Fraud – 18 U.S.C. §1349

1.  At times material to this indictment:

    a.  Health Center Management, LLC, Simple Health Plans, LLC, Health Benefits One, LLC, and Simple Insurance Leads, LLC, were Florida corporations. These businesses operated collectively as "Simple Health."

    b.  Simple Health operated telephone call centers in several locations in South Florida, including Hollywood, Boca Raton, and Doral. Simple Health also had offices in Dallas, Texas, the Dominican Republic, and Panama.

    c.  Acting through its agents, Simple Health entered into contracts to sell health insurance products through telemarketing.

   d. Health Insurance Innovations ("HII") provided sales and administrative services to insurance companies. Simple Health sold Limited Indemnity Insurance policies on HII's behalf.

   e. Defendant STEVEN DORFMAN was an owner of the Chief Executive Officer of Simple Health.

   f. Defendant CANDIDA L. GIROUARD was the Chief Compliance Officer of Simple Health.

   g. Defendant JOHN A. SAND was the Vice President of Sales of Simple Health.

  2. At times material to this indictment:

   a. Comprehensive Health Insurance, also known as "Major Medical," was a type of health insurance that was designed to cover a majority percentage of the medical costs an average American would pay during the year. Comprehensive Health Insurance plans typically had a set amount, or deductible, which the patient is responsible for paying. After the deductible was met, a Comprehensive Health Insurance plan typically paid a majority percentage of the remainder of the patient's medical bills. Comprehensive Health Insurance also typically had a maximum out-of-pocket limit. Once the patient reached the maximum out-of-pocket limit, the Comprehensive Health Insurance plan paid 100% of the patient's in-network care for the remainder of the year.

   b. Limited Indemnity Plans, also known as Fixed Indemnity Plans, paid only a predetermined fixed amount for certain health care expenses. After the insurance company paid the predetermined amount, the patient was responsible for paying all of his or her medical expenses

above that amount. Limited Indemnity Plans were typically intended to operate as a supplement to a patient's Comprehensive Health Insurance.

        c      A Preferred Provider Organization ("PPO") was a type of health plan that contracted with medical providers, such as hospitals and doctors, to create a network of participating providers. The PPO negotiated fees that would be paid to its participating providers. Patients who were members of a PPO paid the lower negotiated rate for medical services rendered by participating providers.

        3.      Beginning on at least May 4, 2012, and continuing until at least November 1, 2018, in the Counties of the Southern District of Illinois, including St. Clair, Madison, Monroe, Jefferson, Clay, Saline, Wayne, and Williamson, and elsewhere, the defendants,

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

and others both known and unknown to the Grand Jury, did knowingly and willfully conspire to commit offenses against the United States, namely to devise and participate in a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing the scheme, and attempting to do so, knowingly to cause to be delivered by United States mail certain items, in violation of Title 18, United States Code, Section 1341, and knowingly to cause wire communications to be made in interstate commerce, in violation of Title 18, United States Code, Section 1343.

        4.      The object of the conspiracy and scheme to defraud was for the defendants to enrich Simple Health and themselves by selling Limited Indemnity Plans through false pretenses and false, misleading, and deceptive sales tactics.

5.      As part of the conspiracy and scheme to defraud, the defendants caused Simple Health to locate customers through Lead Generation Websites.  These Lead Generation Websites were designed to appear when individuals searched the internet for certain terms related to health insurance.  These websites typically offered individuals a free quote on health insurance if they filled out an online form and/or provided certain information.

6.      After individuals filled out these forms or provided the requested information, employees known as "fronters," who were affiliated with the Lead Generation Website companies, contacted the individuals and offered to help them get a health insurance quote.  The fronters took some basic information from the individuals and then transferred them to salespersons at telemarketing businesses, such as Simple Health.

7.      Simple Insurance Leads, LLC, operated its own Lead Generation Website.  Leads provided by Simple Insurance Leads, LLC, were provided to Simple Health, and also sold to other health insurance telemarketing companies.

8.      The Lead Generation Websites which generated leads for Simple Health often contained false, misleading, and deceptive information.  For example, many of the Lead Generation Websites contained references to programs such as the Affordable Care Act (or "ACA"), "Obamacare," and legitimate businesses and organizations, such as the AARP and Blue Cross/Blue Shield.  When individuals searched for these terms on the internet, these Lead Generation sites would appear.  If the individuals opened these sites, the references to these legitimate programs and businesses gave the false impression that the sites were affiliated with those programs and businesses.

9.      Defendants DORFMAN, GIROUARD, and SAND developed, revised, and provided scripts for the Simple Health salespersons to use in selling and attempting to sell Limited

Indemnity Plans to the individuals who were contacted through the Lead Generation Websites. These scripts were false and misleading. The scripts were designed to create the false impression that the Limited Benefit Plans sold by Simple Health covered more medical services, and paid larger portions of the customers' medical bills, than they actually did.

10.     The scripts typically required the salespersons to state that Simple Health represented "most" or "many" of the "A rated carriers" in the customer's state. This statement created the false impression that Simple Health was functioning as a broker for the top rated health insurance businesses in the customer's state and would help the customer choose an insurance policy that met their needs. In fact, the purpose of the calls was for Simple Health to sell the customers a Limited Benefit Policy which it had a contract to sell.

11.     The scripts also usually required the salespersons to ask the customers certain "pre-qualification" questions. This was deceptive because the Limited Indemnity Plans Simple Health was selling did not have pre-qualification requirements.

12.     After the pre-qualification questions, the scripts directed the salespersons to say that they would try to find the customers a PPO where they could keep their own doctors. This was deceptive, because many doctors did not accept the Limited Indemnity Plans that Simple Health was selling.

13.     As the defendants well knew, the salespersons frequently told the customers that they could receive up to 70% off their medical bills through the PPO plans that Simple Health was selling. This was misleading, because any discounts provided by the Simple Health plans were typically substantially less than 70%.

14.     The scripts also required the salespersons to tell the customers that they were going to perform a search to look for a policy that met the customers' needs. This was a misleading

5

statement, because the salespersons did not search for different policies that might meet the customers' needs. Instead, after a brief pause, the salespersons continued by attempting to sell particular Limited Benefit Plans which Simple Health had contracts to sell.

15. The scripts further required the salespersons to falsely tell the customers that participation in the Limited Indemnity Plans was typically limited to large groups and associations. In addition, the scripts stated that the plans were similar to insurance that individuals get through their employers. This was misleading, because most employer provided health insurance plans are Comprehensive Health Insurance, which provides substantially more coverage than the Limited Benefit Plans that Simple Health was selling.

16. Throughout the scripts, various phrases were included that were designed to mislead the customers into believing the Limited Benefit Plans would cover most of their medical expenses. These phrases included: "The whole idea of this plan is to make your out of pocket expenses as low as possible . . . ." and "When all is said and done, you end up with pennies on the dollar!!"

17. The scripts also contained examples of what the customers could potentially end up paying out of their own pockets for doctor and hospital visits. The dollar figures selected for these examples were such that they made it seem that the Limited Benefit Plans provided significant coverage, when, as defendants well knew, there was a substantial likelihood that the customers would end up owing thousands of dollars for significant medical bills and hospitalizations.

18. The scripts also misled the customers into believing that the Limited Benefit Plans would cover their prescription drug costs, when all that was provided was a prescription drug discount card.

19.     As the defendants were well aware, many of the Simple Health salespersons made additional false statements and misrepresentations, beyond those contained in the scripts, for the purpose of selling the Limited Indemnity plans.

20.     At the conclusion of the sales calls, the Simple Health salespersons transferred the customers to other Simple Health employees for the purpose of recording Verifications.  During the Verifications, Simple Health employees read various terms and conditions relating to the Limited Indemnity Plans and asked the customers to agree that they understood the terms and conditions.

21.     The scripts required the salespersons to prep the customers so that they would agree that they understood the terms and conditions during the Verifications.   For example, the salespersons told the customers not to ask questions during the verifications, because they were only allotted a certain amount of time for the taping and the Verification agents would have to start the recordings over again if any questions were asked.

22.     The customers were further told that the Verification agents would tell them that the plans they were purchasing were not Major Medical Plans.  According to the scripts, the reason the Limited Indemnity Plans were not considered Major Medical was that Major Medical must have deductibles and co-insurance.  On other occasions, the salespersons told the customers that the plans they were selling did not qualify as Major Medical because they did not cover pregnancy, substance abuse, and mental health.  These explanations were misleading, because they omitted the most significant difference between Limited Indemnity Plans and Major Medical:  Limited Benefit Plans only cover customers' medical expenses up to a limited cap amount, whereas Major Medical typically covers the majority of a customers' medical expenses after their deductible amounts are reached.

7

23.     Towards the end of the scripts, the salespersons told the customers that if they had any questions or concerns about their policies, they should call Simple Health's Customer Service Department, rather than the insurance companies that issued the policies. This was done to prevent the insurance companies from learning of Simple Health's deceptive and misleading sales tactics, and to give Simple Health an opportunity to prevent the customers from cancelling their policies and causing Simple Health to lose the commissions earned on those sales.

24.     Simple Health instructed its Customer Service employees to read scripted "Rebuttals" to the customers. These rebuttals were designed to mollify the customers, convince them that the Limited Indemnity Plans they had purchased were valuable products, and prevent the customers from cancelling their policies. The rebuttals provided to the Customer Service employees included responses for customers who were upset: (1) that they had incurred significant medical expenses that they had been led to believe would be covered by the Limited Indemnity Plans; (2) that their doctors and hospitals did not accept the Limited Indemnity Plans; and (3) that their prescription drug costs were not covered by the Limited Indemnity Plans.

25.     If the customers stated that they wanted to cancel their policies, they were transferred to a separate component of the Customer Service Department that was known as the "Saves Team." The goal of the Saves Team was to "save" the sale and prevent the customers from cancelling their policies. Members of the Saves Team were also given scripted rebuttals to use.

26.     A separate group of Simple Health employees, known as the "Compliance Team," was tasked with responding to all the complaints that Simple Health received from state Attorneys General's offices, Better Business Bureaus, and other entities and individuals.

27.     The conspiracy and scheme to defraud operated from approximately May 4, 2012, through at least November 1, 2018. During this period, through the use of its deceptive and

misleading sales tactics and false pretenses, Simple Health sold health insurance products to more than 400,000 individuals. These sales generated revenues for Simple Health of more than $190,000,000. The victims were located in all fifty of the United States. At least 1175 victims of the scam were located within the Southern District of Illinois and resided in all 38 counties in the district.

28.     In furtherance of and as a foreseeable consequence of the conspiracy and scheme to defraud, Simple Health employees caused telephone calls to be transmitted in interstate commerce by means of wire and radio communications between southern Florida and consumers located throughout the United States, including the Southern District of Illinois.

29.     In furtherance of and as a foreseeable consequence of the conspiracy and scheme to defraud, Simple Health employees caused insurance cards and insurance policy information to be sent via the United States Mail, according to the direction thereon, to addresses located throughout the United States, including the Southern District of Illinois.

All in violation of Title 18, United States Code, Section 1349.

The offense occurred in connection with the conduct of telemarketing, and the offense victimized ten or more persons over the age of 55, in violation of the SCAMS Act, punishable under Title 18, United States Code, Section 2326.

## COUNT TWO
### Wire Fraud – 18 U.S.C. § 1343

1.      Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.      On or about April 26, 2017, in Saline County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be transmitted by means of a wire communication in interstate commerce, from Florida, to Saline County, Illinois, certain signals, namely a telephone conversation between a Simple Health salesperson and persons with the initials C.E. and G.E. during which the salesperson solicited C.E. and G.E. to purchase an Axis Insurance Company Limited Indemnity policy;

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT THREE
### Wire Fraud – 18 U.S.C. § 1343

1.      Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.      On or about May 17, 2017, in Effingham County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be transmitted by means of a wire communication in interstate commerce, from Effingham County, Illinois, to Florida, certain signals, namely an electronic transfer of $127.81 from the bank account of S.B. at Crossroads Bank to the bank account of Health Insurance Innovations at Key Bank in Florida;

All in violation of Title 18, United States Code, Sections 1343 and 2.

11

## COUNT FOUR
### Wire Fraud – 18 U.S.C. § 1343

1.      Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.      On or about May 25, 2017, in Madison County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,<br>
CANDIDA L. GIROUARD, and<br>
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be transmitted by means of a wire communication in interstate commerce, from Madison County, Illinois, to Florida, certain signals, namely an electronic transfer of $101.81 from the bank account of P.G. at Altonized Community Federal Credit Union to the bank account of Health Insurance Innovations at Key Bank in Florida;

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FIVE
### Wire Fraud – 18 U.S.C. § 1343

1.      Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged

here.

2.      On or about June 28, 2017, in Monroe County, within the Southern District of

Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand

jury, for the purpose of executing the scheme to defraud described in Count One, and attempting

to do so, knowingly did cause to be transmitted by means of a wire communication in interstate

commerce, from Georgia to Florida, certain signals, namely an electronic transfer of $452.84 from

R.P.'s Capital One credit card account to the bank account of Health Insurance Innovations at Key

Bank in Florida;

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX
### Wire Fraud – 18 U.S.C. § 1343

1.      Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.      On or about July 6, 2017, in Madison County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be transmitted by means of a wire communication in interstate commerce, from Madison County, Illinois, to Florida, certain signals, namely an electronic transfer of $371.40 from the bank account of M.I. and D.I. at First MidAmerica Credit Union to the bank account of Health Insurance Innovations at Wells Fargo in Florida;

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SEVEN
### Wire Fraud – 18 U.S.C. § 1343

1.      Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.      On or about October 31, 2017, in Madison County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be transmitted by means of a wire communication in interstate commerce, from Florida, to Madison County, Illinois, certain signals, namely a telephone conversation between a Simple Health salesperson and a person with the initials J.H. during which the salesperson solicited J.H. to purchase an Axis Insurance Company Limited Indemnity policy;

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT EIGHT
### Mail Fraud – 18 U.S.C. § 1341

1.  Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.  On or about March 19, 2018, in Saline County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be delivered by United States Mail, according to the direction thereon, an envelope containing an insurance card issued by AFSLIC, that envelope being addressed to an individual with the initials T.H.'s address on street Glenwood Avenue in El Dorado, IL 62930;

All in violation of Title 18, United States Code, Section 1341 and 2.

## COUNT NINE
### Mail Fraud – 18 U.S.C. § 1341

1.    Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.    On or about March 27, 2018, in Williamson County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be delivered by United States Mail, according to the direction thereon, an envelope containing an insurance card issued by AFSLIC, that envelope being addressed to an individual with the initials T.D.'s address on Copeland Street in Marion, IL 62959;

All in violation of Title 18, United States Code, Section 1341 and 2.

## COUNT TEN
### Wire Fraud – 18 U.S.C. § 1343

1.      Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.      On or about May 22, 2018, in Jefferson County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be transmitted by means of a wire communication in interstate commerce, from Texas, to Jefferson County, Illinois, certain signals, namely a telephone conversation between a Simple Health salesperson and a person with the initials R.A. during which the salesperson solicited R.A. to purchase a Limited Indemnity policy;

All in violation of Title 18, United States Code, Sections 1343 and 2.

18

**COUNT ELEVEN**
**Mail Fraud – 18 U.S.C. § 1341**

1.    Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged

here.

2.    On or about July 4, 2018, in Madison County, within the Southern District of

Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand

jury, for the purpose of executing the scheme to defraud described in Count One, and attempting

to do so, knowingly did cause to be delivered by United States Mail, according to the direction

thereon, an envelope containing an insurance card issued by Axis Insurance Company, that

envelope being addressed to an individual with the initials C.J.'s address on Rixon Street in Alton,

IL 62002;

All in violation of Title 18, United States Code, Section 1341 and 2.

19

## COUNT TWELVE
### Mail Fraud – 18 U.S.C. § 1341

1.    Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.    On or about October 27, 2018, in Wayne County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be delivered by United States Mail, according to the direction thereon, an envelope containing an insurance card issued by AFSLIC, that envelope being addressed to an individual with the initials T.C.'s address on Sixth Street in Fairfield, IL 62837;

All in violation of Title 18, United States Code, Section 1341 and 2.

## COUNT THIRTEEN
### Wire Fraud – 18 U.S.C. § 1343

1.      Paragraphs 1, 2, and 4 through 27 of Count One of this indictment are realleged here.

2.      On or about May 7, 2018, in St. Clair County, within the Southern District of Illinois, defendants

STEVEN DORFMAN,
CANDIDA L. GIROUARD, and
JOHN A. SAND,

while aiding and abetting and being aided and abetted by others known and unknown to the grand jury, for the purpose of executing the scheme to defraud described in Count One, and attempting to do so, knowingly did cause to be transmitted by means of a wire communication in interstate commerce, from St. Clair County, Illinois, to Florida, certain signals, namely an electronic transfer of $220.23 from the bank account of an individual with the initials K.E. at First Bank to the bank account of Health Insurance Innovations at Key Bank in Florida;

All in violation of Title 18, United States Code, Sections 1343 and 2.

## **FORFEITURE ALLEGATION**

As a result of the commission of the offense described in Counts 1 through 13 of this Indictment,

STEVEN DORFMAN,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(8), any and all property constituting, or derived from, any proceeds said defendant obtained, directly or indirectly, as a result of said violations. The property to be forfeited includes, but is not limited to:

**Bank Accounts:**

1.  JP Morgan Chase accounts held as follows:
    a. Simple Insurance Leads LLC, Account Number ending in 3639; and
    b. Senior Benefits One LLC, Account Number ending in ending in 5910.

2.  Iberia Bank accounts held as follows:
    a. Health Benefits One, Account Number ending in 9606;
    b. Health Benefits One, Account Number ending in 9614;
    c. Health Benefits One, Account Number ending in 9622;
    d. Simple Insurance Leads, Account Number ending in 9630;
    e. Senior Benefits One, Account Number ending in 9657;
    f. Health Center Management, Account Number ending in 9673;
    g. Innovative Customer Care, Account Number ending in 9681.

3.  Evo Payments account held as follows:
    a. Health Benefits One, Account Number ending ins 5247 and 4411;

4.  UBS account held as follows:
    a. Health Benefits One, Account Number ending in 1048YB; and
    b. Health Benefits One, Account Number ending in 1012YB.

5.  Banco Popular Dominican Republic accounts held as:
    a. Soluciones Omfri SRL, Account Number ending in 0296;
    b. Soluciones Omfri SRL, Account Number ending in 6795;
    c. Unknown Account Name, Account Number ending in 1419;
    d. Unknown Account Name, Account Number ending in 1509; and
    e. Unknown Account Name, Account Number ending in 4465.

6.     Banco Lafise Panama accounts held as:
a. Health Benefits Center Corp., Account Number ending in 1229.

7.     Iberia Bank accounts held in the name of Steven Dorfman:
a. Checking Account Number ending in 9711;
b. Checking Account Number ending in 9738;
c. Checking Account Number ending in 9746;
d. Checking Account Number ending in 9754; and
e. Checking Account Number ending in 9762.

8.     TD Ameritrade accounts held as:
a. Stocks (FB) Account Number ending in 1707; and
b. Stocks (AMZN) Account Number ending in 1707.

9.     Wells Fargo Advisors account held as:
a. Stocks (JPM) Account Number ending in 6009.

10.    Wells Fargo accounts held as follows:
a. Dorfman & Freitas, Checking Account Number ending in 8531;
b. Dorfman & Freitas, Checking Account Number ending in 8523;
c. Steve Dorfman, Checking Account Number ending in 0747;
d. Steve Dorfman, Checking Account Number ending in 6609;
e. Steve Dorfman, Checking Account Number ending in 7787;
f. Steve Dorfman Revocable Trust, Checking Account Number ending in 4077;
g. Dorfman, Checking Account Number ending in 0835.

**Cash:**

11.    $40,325.00 in United States Currency.

**Casino Chips:**

12.    Casino chips from various U.S. and International Casino establishments.

**Commissions:**

13.    Patriot Health commissions payable to Health Benefits One LLC;
14.    Wellness Plan of America commissions; and
15.    HII, Health Insurance Innovations Contracting commissions.

**Furniture, fixtures, and equipment:**

    16.     Located at the Hollywood Office.

**Jewelry:**

    17.     One Audemars Piguet Watch;
    18.     One Carier Roadster Watch;
    19.     One Cartier Santos Watch;
    20.     One Richard Mille Watch;
    21.     Three Cartier Bracelets;
    22.     One Cartier Ring Panther;
    23.     One Gold Rope Necklace with Star of David;
    24.     One Gold Necklace Floral Cluster;
    25.     One Diamond Engagement Ring;
    26.     One Diamond Wedding Band (female); and
    27.     One Diamond Wedding Band (male).

**Real Property:**

    28.     Real property located at 1709 Enclave Court, Las Vegas, Nevada - developable residential lot located in Las Vegas, Nevada, and all attachments, improvements, and appurtenances thereto.

**Sports Memorabilia:**

    29.     Yankees Final Game at Yankee Stadium framed photo "Perfect Game Battery Mates with PG Insc. v/COA;
    30.     Marlins Inaugural Game 4/5/1993 framed photo of Joe Robbie Stadium, Marlins v. Dodgers;
    31.     Framed photo of Dwayne Wade #3, Miami Heat signed with COA;
    32.     Framed photo of Orange Bowl Stadium 1937–2007 with piece of wall from home locker room (Limited Edition 500);
    33.     Framed Super Bowl XXV tickets 1/27/1991 Giants 20 Buffalo 19;
    34.     Framed Letter from NY Yankees to Bruce Dorfman congratulating the birth of Steven with signed Yogi Berra contract;
    35.     Framed Ruettiger #45 Jersey, signed;
    36.     Framed Iron Mike Tyson Title Belt, signed;
    37.     Framed "Rocky" red, white, and blue boxing trunks signed Stallone v. Dolph Lundgren;
    38.     Framed Iron Mike Tyson black boxing trunks, signed (Collector's Edition 439/500);
    39.     Framed Arnold Palmer Pin Flag, signed PGA Tour;
    40.     Framed Chicago Bulls Michael Jordan #23 Jersey, signed;
    41.     Framed NY Yankees Mickey Mantle #7 Jersey and broken bat, signed;
    42.     Framed NY Giants photo of Lawrence Taylor #56;

43. Framed 1936 Hialeah Dog Racing with Monkey as Jockeys photo;
44. Encased signed football by Dan Marino #13, Miami Dolphins;
45. Encased signed football by #99 Miami Dolphins;
46. Encased signed football helmet UM Team 12-0 2001 National Champions;
47. Encased signed football helmet Emmitt Smith #22 Dallas;
48. Encased small football helmet signed by Rudy Ruettiger;
49. Encased signed basketball Miami Heat;
50. Encased signed basketball Boston Celtics;
51. Encased signed baseball JD Drew;
52. Encased signed baseball Chipper Jones;
53. Encased signed baseball Alex Rodriguez;
54. Encased signed baseball Yogi Berra & Don Larsen, 1956 World Series Perfect Game;
55. Encased signed baseball Ron Fraser;
56. Encased signed baseball Joe DiMaggio;
57. Encased signed baseball Don Mattingely;
58. Encased signed baseball – Unknown – 2;
59. New York Yankees Replica Ring, Size 11;
60. Framed Art Hand Holding UM Helmet;
61. Framed Photo Cal Ripken Jr. 3,000th Hit with Game Ticket 4-15-2000; Ltd. Edition 140/250;
62. Framed Tiger Woods and Michael Jordon Golf Photo, signed;
63. Framed Masters Pin Flag signed by Phil Mickelson, 6/12/15;
64. Framed NY Yankees Tickets 27 World Championships;
65. Framed UM Michael Irvin #47 Jersey, signed;
66. Framed NY Yankees Black Baseball Bat Signed by Aaron Judge 71/99; and
67. Framed NY Yankees Baseball Bat "2000 Subway Series" multiple signatures.

**Vehicles:**

68. One 2015 Rolls-Royce Wraith, VIN: SCA665C54FUX85225, with all accessories, attachments, and components thereon.

69. One 2013 Land Rover Range Rover, VIN: SALGV2EF1DA100321, with all accessories, attachments, and components thereon.

**A TRUE BILL**



Digitally signed by
STEVEN WEINHOEFT
Date: 2022.02.22
21:17:38 -06'00'

STEVEN D. WEINHOEFT
United States Attorney


SCOTT A. VERSEMAN                    PETER T. REED
Assistant United States Attorney     Assistant United States Attorney

Recommended bond: _____ $10,000 Unsecured _____

26